Paul SMITH Petitioner

v.

**Julius WILSON, Warden Respondent**

**No. 1:01CV2750.**

United States District Court,
N.D. Ohio,
Eastern Division.

Sept. 13, 2002.

James R. Willis, Esq., Cleveland, OH, for Petitioner.

M. Scott Criss, Office of the Attorney General, State of Ohio, Corrections Litigation Section, Columbus, OH, for Respondent.

### MEMORANDUM OF OPINION AND ORDER CONDITIONALLY GRANTING PETITION FOR WRIT OF HABEAS CORPUS

WELLS, District Judge.

In September 1996, after a trial, a jury found Paul Smith ("Smith") guilty of felonious assault with specifications. After Mr. Smith's unsuccessful appeals of his conviction to the Ohio Court of Appeals and the Ohio Supreme Court, the United States Supreme Court remanded the case to the Ohio Court of Appeals, which, upon reconsideration, again denied Smith's appeal. The Ohio Supreme Court dismissed Mr. Smith's appeal of that denial. Mr. Smith's petition for state post-conviction relief also was denied by the state court of appeals and state supreme court. An additional direct appeal before the state courts was unavailing.

On 5 December 2001, Petitioner Paul Smith filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, asserting five grounds for relief. Respondent Julius Wilson filed a return of writ. On 6 June 2002, United States Magistrate Judge Patricia A. Hemann issued a Report and Recommendation ("R & R"), recommending that the petition be granted. Respondent objected to the R & R. Petitioner filed limited objections to the R & R.

A federal court's review of a habeas corpus petition is very different from a state court's review of a direct appeal. The Antiterrorism and Effective Death Penalty Act of 1996 limits a federal district court's ability to grant a writ of habeas corpus where a state court considered the federal claim on the merits. When a federal court examines a state court's legal decision, the question is not whether the state court's decision was incorrect, but whether the decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d). When a federal court examines a state court's factual determination, the question is whether it was an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *Id.* It is not enough that a federal court disagrees with a state court decision; to grant a petition for a writ of habeas corpus, the federal court must find that the state court's decision was unreasonable. In order to assess the rationality of a state court decision, a federal district court must examine the entire state record for itself.

In this case, because this Court finds that Mr. Smith's first ground for relief has merit, the focus of the Court's analysis is on the admission of a written statement at Mr. Smith's trial. For the reasons discussed below, upon full review of the record, the Magistrate Judge's recommendations are adopted, and Mr. Smith's petition

for a writ of habeas corpus will be conditionally granted.

## I. FACTUAL BACKGROUND

The September 1996 term of the Cuyahoga County grand jury indicted Mr. Smith on one count of felonious assault with two firearm specifications and two repeat violent offender specifications. (Docket # 14 at Exhibit 1).

### A. The State Appellate Court's Description of the Facts

The Ohio Court of Appeals for the Eighth District described the facts of the case as follows:

> [O]n August 1, 1996, Iris Wilson and Paul Smith, a Jamaican, drove around in an effort to collect a drug debt from "Bootsie," a.k.a. Mock Rogers; later that evening, Smith saw Rogers, Kenyatta Wells, and Shantell Jones leave the Calypso Bar, located at Lakeshore and St. Clair Avenue, in Cleveland. As they drive [sic] off in Wells' pickup truck, Smith told Wilson to follow them, and when Wells reached the intersection of Lakeview Avenue and Dupont, Wilson yelled to Bootsie. Wells drove on, but when he reached the next light, Wilson again yelled, "Bootsie, somebody wants to see you," and at that point, Smith exited the car, walked over to the passenger side of Wells' truck, shot out the window, put his hand into the vehicle, and shot Wells in the right calf. Rogers, believing he had been shot, told Wells, "I am hit! I am hit! It was Iris and Paul."

> Wells then drove to a nearby Finast grocery store, where a security guard called police and an ambulance to transport Wells to the hospital. Officer Kennedy Jones of the Sixth District Police Department arrived at the Finast store, observed bullet holes in the vehicle, spoke with Rogers and Shantell Jones, who appeared visibly shaken, and

through that conversation, learned the identities of Smith and Wilson.

> Following an investigation, police arrested Wilson and Smith ... While in custody and after she had an opportunity to speak with her defense attorney who advised her not to make a written statement, Wilson signed a waiver of her rights and gave a written statement to the police which detailed that she drove Smith from Calypso's where he first spotted Rogers to East 110th and Lakeview. She further related that Smith then exited the car and started shooting into Wells' truck. Smith got back into the vehicle and told Wilson to drive ...

> At trial and after the jury had been seated but prior to opening statements of counsel, the court ruled that Wilson's statement would not be admitted and, in response, the state dismissed its case against her and proceeded with its case against Smith. During its case-in-chief, the state called three witnesses, including Wells, who recounted the events of August 1, 1995, identified Smith as the gunman, and testified that Rogers had told him that Smith did the shooting just after it occurred. The state next called Wilson, who invoked her Fifth Amendment right against self-incrimination and refused to testify even after the state granted her transactional immunity because she feared federal prosecution for harboring Smith, an illegal alien. The state then offered, and the court admitted, the written statement Wilson had given to the police in which she stated Smith shot Wells.

*State v. Paul A. Smith*, (Ohio App. 8 Dist. Dec. 9, 1999), Docket # 14, Exhibit 15 at 2–4.

### B. Testimony Not Discussed by the State Appellate Court

After *de novo* review of the entire rec-

ord,[1] it is clear to this Court that trial testimony not mentioned by the Ohio Court of Appeals is relevant to this petition and must be examined in detail. This Court cannot fulfill its habeas corpus role of determining whether the Ohio Court of Appeals' decision was reasonable without reference to testimony that was not discussed by the state appellate court in its opinion.

Kenyatta Wells was the state's first witness at trial. He testified as follows:

Q. Did anyone pull along side the vehicle as you were driving it?

A. Yes, it did.

Q. Could you tell us where you were the first time that vehicle pulled up next to you?

A. We were coming to a stop at the light right there at Lakeview and Dupont.

Q. What happened, if anything, when you stopped at that light?

A. A car rolled on the side of us.

Q. On which side?

A. On the passenger's.

Q. Okay.

A. Go ahead.

A. The person who was driving called Mr. Rogers' name, so I pulled away from the car.

Q. Who called Mr. Rogers [sic] name?

A. Iris.

Q. And how did she go about doing that?

A. She pulled on the side of the passenger's side and had the window down and was like "Bootsie".

Q. Why did you pull away?

A. Because I didn't know her and he didn't know who she was right off the bat.

Q. Did there come a time when that same vehicle pulled up on you again?

A. Yes, it did.

Q. Where did that happen?

A. Pulled away and I pulled up to the light a little bit more. She called his name again.

Q. What intersection were you at?

A. We were at the light of Dupont.

Q. And did she again roll the window down?

A. Yes, she did.

Q. Did Mr. Rogers roll his window down?

A. Yes, he did. He started to.

Q. At that point in time did you recognize the driver of the other vehicle that pulled up to you?

A. No, I didn't.

Q. What did she say at that time?

A. She said "Bootsie" somebody wants to see you.

Q. Then what happened?

A. That's when Paul Smith exited the car, came around and repeated "mother fucker" and shot the window out and put his hand into the car and started shooting.

Q. Where did he come from?

A. Out of the passenger's side of the car . . .

Q. Do you see anyone else get out of the car?

---

1. On 6 June 2002, when she issued her R & R, Magistrate Judge Hemann did not realize that she had not been provided with all trial testimony. On 18 June 2002, respondent filed a transcript of the state court proceedings that included all trial testimony. (Docket # 25). After reviewing the complete transcript and the R & R, this Court concluded that it would consider the complete transcript de novo and that a re-referral to Magistrate Judge Hemann was unnecessary.

A. No, I didn't.

Q. And he came right up to the passenger's side, is that correct?

A. Yes, he did.

Q. After he fired once and broke the window he continued firing?

A. Yes, he did.

Q. And was he as close to you as he was right next to the passenger door and you were in the driver's seat, is that correct?

A. Yes.

Q. Did you recognize him at that point in time?

A. No, I didn't.

Q. When did you realize who it was that shot you?

A. After I pulled away from the light, Mr. Rogers said—

MR. WILLIS [2]: Objection.
THE COURT: Sustained.

A. After I pulled away from the light Mr. Rogers said.

MR. WILLIS: Objection. Judge may we approach.
THE COURT: Yes.

— -

(Discussion had between Court and counsel at the bench out of hearing of the jury.)

— -

THE COURT: Your objection is noted. Overruled. Proceed.

Q. Immediately after those shots were fired you began to pull away?

A. Yes.

Q. What did "Bootsie" say at that point in time?

MR. WILLIS: Objection.
THE COURT: Overruled.

A. He said I am hit, I am hit. And the young lady that was in the car was, no, you are not, no you are not. And that time was when Mr. Rogers was he was underneath—

MR. WILLIS: Objection.

A. —of the car or the truck was pushing my leg telling me to drive, drive.

Q. You said something before about who the person was who shot you?

A. Yes. Mr. Rogers said that was Iris and Paul.

MR. WILLIS: Objection.

Q. Pardon me.

A. He said that was Iris and Paul.

THE COURT: Overruled.

Q. At that point in time did you recognize Iris and Paul?

A. No, I didn't.

(Docket # 25, Tr. at 310–14).

Wells further testified regarding his knowledge of Smith and identified him in court:

Q. What was the name you gave Detective Wheeler as being the person who shot you?

MR. WILLIS: Objection?

A. Paul Smith.

THE COURT: Overruled.

Q. How do you know Paul Smith?

A. Through Mr. Rogers selling houses.

Q. And how long had you known Paul Smith?

A. Two years.

Q. And what I don't understand—what was the relationship between Mr. Rogers and Paul Smith, if you know?

A. Just going, buying houses and selling, showing houses.

**2.** James Willis, Smith's trial and appellate counsel.

Q. What did you have to do with that?

A. Just being there, going with them.

Q. Did you have conversation with Paul Smith at any time?

A. No, I didn't.

Q. Were you present went [sic] Paul Smith had conversation with Mr. Rogers?

A. No, I wasn't.

Q. You saw them together, didn't you?

A. Yes.

Q. Weren't they talking to each other?

A. They were more or less like privately, like walking to the side and talk.

Q. Did you know who he was?

A. Yes.

Q. Do you see him in the courtroom today?

A. Yes I do.

Q. Will you pointed [sic] him out and tell us where he is seated and what he is wearing?

A. I can't see what he is wearing but he is right there.

Q. What color shirt is he wearing?

THE COURT: You can stand up if you want.

A. White shirt is [sic] and black vest.

Q. Go ahead.

A. White shirt and black vest.

MR. HORN [3]: May the record reflect the witness has identified the defendant?

THE COURT: The record may so reflect.

(Docket # 25, Tr. at 318–320).

Mr. Wells identified Mr. Smith as the shooter a second time:

Q. The man that shot you in the evening ever [sic] August 1, 1996, do you see him in the courtroom?

MR. WILLIS: Objection.

A. Yes, I do.

Q. Who is that?

A. Paul Smith.

(Docket # 25, Tr. at 326–327).

On cross-examination, Mr. Wells responded "Yes" when asked if it was Rogers that told him it was Iris and Paul. (Tr. at 330). On re-redirect, the issue of the shooter's accent was discussed:

Q. When the defendant walked up to the vehicle in which you were driving and stated, what's up mother fucker, did you recognize anything about his voice?

A. Yes.

Q. What was that?

A. The Jamaican . . .

Q. You are saying that he had an accent, is that what you are saying?

A. Yes.

Q. And have you heard Jamaicans speak before?

A. Yes, I have.

Q. And this person, the defendant, when he walked up to the car and said, what's up, mother fucker, he said it with a Jamaican accent?

A. Yes, he did.

(Tr. at 336–337). On re-cross, Mr. Wells testified that he knew Mr. Smith's accent because Wells answered the door when Smith came to Mr. Rogers' house. (Tr. at 339–340).

The State also called police officer Kennedy Jones ("Officer Jones") to testify. Officer Jones interviewed Wells, Shantell Jones, and Rogers about 30 minutes after the shooting. Officer Jones' testimony included the following exchange:

Q. What did Ms. Jones tell you? . . .

---

3. Michael Horn, Assistant County Prosecutor.

A. She stated to us circumstances happening in connection with a shooting that she was in the—she was the passenger, one of the passengers in the vehicle. She was actually seated between the two other occupants when they came to a stop light at 110th and Dupont. And another vehicle pulled up next to them, a female in the vehicle yelled out the name "Bootsie", which is the nickname for ... Rogers....

Q. What did you say happened after the female yelled out "Bootsie"?

A. After the female yelled out, the male jumped out of the vehicle and started to shoot at their vehicle. At that point they hit the floor basically and after the shooting stopped they hi-tailed it to the Finast....

(Tr. at 369–370). As Magistrate Judge Hemann points out, although Officer Jones testified that his investigation uncovered the first names of the driver of the car and the shooter, Officer Jones, in fact, said nothing in his testimony at trial to directly identify either the driver or the shooter:

Q. Officer, without telling us the name; were you able through the course of your investigation to learn the first names of the two suspects?

MR. WILLIS: Objection.

THE COURT: Overruled.

THE COURT: Yes or no?

A. Yes, I was.

(Tr. at 374–375). Officer Jones did not at any time during his testimony provide the names that he had uncovered.

The next trial witness whose testimony is relevant to this petition was Detective Thomas Wheeler. Magistrate Judge Hemann carefully describes Detective Wheeler's testimony:

On August 17, 1996 at about 5:00 p.m. police officers stopped Wilson while she was driving a car and detained her without an arrest warrant. *Id.* at 441, 459–

60. Wheeler testified that he did not know why the detaining officers stopped Wilson. *Id.* at 461. Wilson was in the company of her two children and a friend, Alicia Richardson ("Richardson"). Tr. at 442–43. When the police officers who stopped her asked to see her driver's license, Wilson produced a New Jersey license identifying her as Renee Davis. *Id.* at 442. The police decided to detain Wilson, and they allowed her to give Richardson custody of her children. *Id.* The police took Wilson to the police station, advised her of her rights, and asked if she wished to make a statement. *Id.* at 444. Wilson refused and asked to speak to an attorney. *Id.* at 450, 463. The police officers then retained Wilson in custody without charging her. *Id.* at 444–50.

Two days later, on the afternoon or evening of August 19, 1996, Wilson sent a message to Wheeler that she wanted to talk to him. *Id.* at 464, 472. When she spoke to Wheeler, she admitted that she was Iris Wilson, not Renee Davis. Wilson and Wheeler spoke to Wilson's attorney, Camino, by telephone, and Camino agreed that he would be present at the police station at 7 p.m. that evening, at which time Wilson would give her statement to the police. *Id.* at 472–73. Camino did not arrive at 7 p.m. After waiting without result for Camino to appear, Wilson and Wheeler spoke with him again by telephone. *Id.* at 473. Wheeler testified that Camino told him that he was unable to be with his client but that it was alright to take a statement from her. *Id.*

Wheeler took a statement regarding the shooting of Wells from Wilson at about 9 p.m. on August 19, 1996. *Id.* at 449. Wheeler's testimony at Smith's trial included the following exchanges:

Q. ... Now, didn't you tell [Wilson] in the presence of Mr. Camino that as soon

as she made a statement that she would be charged and then she would be able to get out on bond[;] you would see to it that she got a reasonable bond?

A. I didn't tell them that I would see that she gets a reasonable bond. I don't set the bond.

Q. I understand that.

A. I don't know.

Q. How about [sic] have you been a detective?

A. Two and a half years.

Q. Are you telling me that you have never gone to a judge and said make the high bond?

A. We can put in a request for high bond.

Q. Okay. If you don't put any requests for a bond then it's usually more reasonable bond than if you had asked for a million dollars, right?

A. Depends on the judge....

Q.... [W]hat you are telling us is that you arrested this woman, she was arrested, 5:00 or 6:00, on the 17th, and then at 9:00, 50 hours or more later she made a statement and then she was charged and bond was set?

A. Okay....

Q.... For whatever reason you decided to soften her up by letting her languish there in jail for a couple of days while she worried about her children until 2100 hours of the 19th when a lawyer couldn't get there and you got a statement from her, right?

A. Yes.

*Id.* at 483–84, 486–87.

(R & R at 7–9).

Detective Wheeler also relayed the substance of Iris Wilson's written statement. According to Wheeler, Wilson stated,

The day of the shooting, Paul had us ride around town all day looking for "Bootsie" ... because "Bootsie" owed him some money. He told me that "Bootsie" owed him $500,000 for drugs ... And as we were coming down East 140th he saw "Bootsie" coming out of Calypso's. When he saw him come out of the bar he called out "Bootsie"'s name and "Bootsie" did not respond. "Bootsie" then got into his car and ... drove off. I was driving and he made me chase him. We chased him to East 110th and Lakeview. When we got to Lakeview we pulled along side of "Bootsie"'s car and at this time, Paul jumped out of the car. He screamed "Bootsie"'s name. His friend he got out of the car and went to the back of the truck. The next thing I knew, Paul was shooting in the car. And at this time I ducked my head and Paul got back into [the] car and told me to drive. I asked him drive where. He said, the streets, to get to the highway. At this time, I asked Paul why did he shoot at them. He said because they acted like they wanted to run. During the course of us riding the male stated that he would hurt me. He also stated to me that he could get to me because they are not going to catch up with him.

(Tr. at 451–453). In her statement, Wilson also stated that there were six persons in the car she was driving: Paul, three other Jamaican males, Wilson's one-year-old baby, and Wilson. (Tr. at 453). Wilson claimed that, earlier that day, Paul made her go to Bootsie's mother's house. (Tr. at 454).

The State's final witness was Officer Xavier Lynch. Officer Lynch testified that he was working as a security guard at the Finast grocery store the night of the shooting. (Tr. at 518–519). He stated that at about 11:20 or 11:30 p.m., Kenyatta Wells, Mock Rogers, and Shantell Jones arrived at the Finast after Wells had been shot. (Tr. 519–520). Rogers, who was "really, really excited and jittery" and "visibly shaken," told Lynch that someone

named Paul shot him and that a woman named Iris was also present at the time of the shooting. (Tr. 521–522, 525, 536, 538). According to Lynch, Rogers then gave descriptions of the Paul and Iris to whom he referred. (Tr. 525–526).

The sole defense witness was Walter Camino, Iris Wilson's attorney. Camino testified about his telephone conversation with Detective Wheeler on 19 August 1996, before Wilson gave her statement to the police. Camino stated, "I told Detective Wheeler that I had advised Ms. Wilson not to give a written statement, but obviously there was nothing I could do to prevent her from doing that." (Tr. at 565). He also testified, "I didn't tell Detective Wheeler not to take a statement. No, I didn't say that." (Tr. at 566). Camino further testified,

A. Well, I asked Detective Wheeler if he was going to charge her. And he said, that he would do that after he took her statement just to get her out.

Q. Okay. So did he do that?

A. They did that yes. I believe that she got out the next day, the next morning . . . .

Q. You knew Iris was concerned about getting out of jail?

MR. HORN: Objection.

THE COURT: Overruled.

A. She wanted to get out of jail, yes. She had three or four kids at home and her mother was taking care of [them] for her.

Q. She wanted to get out in the worst kind of way?

A. That's correct.

Q. Mr. Wheeler made it clear after she made a statement that she would be able to get out of jail and he had seen to it to get her bond reduced

or get her a low bond if she would make the statement.

Q. If she made a statement?

A. Right.

(Tr. at 569, 572).

During the State's closing arguments, the prosecution referred to Wilson's statement. Prosecutor Michael Sullivan stated,

Detective Wheeler also told you he talked to Iris and that Iris gave him a statement, and whether or not her attorney or the person she contacted thought she give the statement or not, it's clear from the statement that she gave it, she gave it voluntarily. And in that statement, she also corroborates Ken [Wells].

She tells you that she was the driver. And she tells you that Paul was the shooter.

(Tr. at 585–586). During his rebuttal argument, Prosecutor Michael Horn comprehensively reviewed the substance of Wilson's statement for the jury. (Tr. 614–616).

The jury found Paul Smith guilty of felonious assault with specifications. On 21 January 1997, he was sentenced to eight years imprisonment for the felonious assault, three years for the firearm specifications, and nine years for the repeat offender specifications. The terms of imprisonment were to be served consecutively for a total maximum sentence of twenty years.

## II. PROCEDURAL HISTORY [4]

### A. Direct appeal

Smith timely filed a notice of appeal. Smith raised four assignments of error in his appeal:

---

**4.** This section adopts the Magistrate Judge's accurate and comprehensive presentation of the procedural background of this case. *See* R & R at 10 –17.

## I

DUE PROCESS WAS DENIED THE APPELLANT WHEN THE STATE, ARGUABLY FOR ULTERIOR MOTIVES, DELAYED MOVING TO DISMISS THE CASE AGAINST IRIS WILSON, A CO–DEFENDANT UNTIL AFTER THE JURY WAS SELECTED.

## II

THE COURT ERRED, AND ABUSED ANY DISCRETION HE MAY HAVE HAD, WHEN HE OVER–RULED THE DEFENSE'S OBJECTIONS TO HEARSAY TESTIMONY PROVIDED BY THE ALLEGED VICTIM THE ADMISSION OF THIS EVIDENCE ALSO VIOLATED APPELLANT'S RIGHT OF CONFRONTATION.

## III

THE COURT ERRED OR ABUSED ITS DISCRETION, AND THE APPELLANT'S RIGHT OF CONFRONTATION WAS VIOLATED, WHEN THE COURT ERRONEOUSLY ADMITTED THE INDISPUTABLY HEARSAY CONTENTS OF A NON–TESTIFYING DECLARANT'S WRITTEN STATEMENT AND ADMITTED THE STATEMENT ITSELF.

## IV

THE DEFENDANT WAS DENIED DUE PROCESS WHEN THE PROSECUTOR WILFULLY, AND FOR PATENTLY ULTERIOR PURPOSES, ELICITED FROM SEVERAL PROSECUTION WITNESSES EGREGIOUSLY PREJUDICIAL AND INFLAMMATORY TESTIMONY, WHICH PRODUCED EVIDENCE THAT INSINUATED THE DEFENDANT HAD COMMITTED VARIOUS UNCHARGED CRIMINAL ACTS.

Smith's supplemental brief added a fifth assignment of error

IN A TRIAL WHERE POSITIVE IDENTIFICATION IS A CRUCIAL ISSUE AND HAS NOT PREVIOUSLY BEEN MADE, THE UNANTICIPATED SURPRISE POSITIVE IDENTIFICATION OF THE DEFENDANT BY THE STATE'S WITNESS CONSTITUTES PREJUDICIAL ERROR REQUIRING A NEW TRIAL, WHEN THE STATE HAS FAILED TO FOLLOW IDENTIFICATION PROCEDURES.

On 21 August 1998, the appellate court overruled Smith's assignments of error and affirmed the judgment of the trial court. The court held in particular that Wilson's statement was properly admitted as evidence against Smith pursuant to the exception to the prohibition against hearsay of Ohio Evid. R. 804(B)(3), admission of a statement against interest. *State v. Smith,* 1998 WL 323545, at \*4 (Ohio App. 8 Dist. June 18, 1998). The court reached this conclusion because it found that Wilson was unavailable to give testimony at the time of trial, the statement was against her interest because it tended to expose her to criminal liability, and corroborating circumstances indicated the statement's trustworthiness. *Id.* at \*4–5. In making the latter finding, the court noted that "Wilson spoke with her attorney about whether to give a statement to the police, and, despite his advice to the contrary, she gave a written statement to them after they had fully advised her of her rights." *Id.* at \*5.

On 5 October 1998, Smith filed a notice of appeal with the Ohio Supreme Court. Smith raised two propositions of law in his memorandum in support of jurisdiction:

**Proposition Of Law No. I:**

It is an abuse of discretion, and the accused's right of confrontation is violat-

ed, when the court admits as substantive proof (i.e., as proof of the matter asserted) the hearsay contents of a non-testifying declarant's written statement and also admits the statement itself.

**Proposition Of Law No. II:**

The defendant was denied due process when the prosecutor wilfully, and for patently ulterior purposes, elicited from several prosecution witnesses egregiously prejudicial and inflammatory testimony, which produced evidence that insinuated the defendant had committed various uncharged acts.

On 23 December 1998, the Ohio Supreme Court dismissed the appeal as not involving any substantial constitutional question.

Mr. Smith timely petitioned the United States Supreme Court for a writ of certiorari. The Supreme Court granted his petition on 21 June 1999, vacating the judgment of the Ohio appellate court and remanding the case for further consideration in light of *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999). *Lilly* held that the statement of an accomplice implicating an accused was not within "a firmly rooted exception to the hearsay rule" and could not be admitted unless accompanied by particular indicia of reliability. Absent such indications, the admission of an accomplice's statement was reversible error unless harmless beyond a reasonable doubt. On 20 December 1999, the Ohio appellate court concluded "that the admission of Wilson's written statement in this case constitutes harmless error beyond a reasonable doubt." Exhibit 15 at 7–8.

On 24 April 2000 Smith moved in the Ohio Supreme Court for a delayed appeal of the appellate court's decision. The Ohio Supreme Court granted Smith's motion on 31 May 2000. In his memorandum in support of jurisdiction, Smith asserted two propositions of law:

**Proposition Of Law No. I:** Where the court admitted as substantive proof of guilt, considerable evidence which offended the accused's right of confrontation and which was clearly hearsay, it is a due process violation to regard the admission of such evidence as harmless.

**Proposition Of Law No. II:** Given that the United States Supreme Court unanimously held that a blame-shifting statement (made by one said to be an accomplice) is a prime example of unreliable hearsay which the confrontation clause prohibits (absent any opportunity for cross-examination), to the extent the flawed notions expressed by the Court of Appeals (in its original Opinion following remand) are thought to survive *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999), such a view cannot withstand meaningful scrutiny.

The Ohio Supreme Court dismissed Mr. Smith's appeal as not involving any substantial constitutional question on 20 September 2000.

**B. Petition for postconviction relief**

On 4 September 1998, Mr. Smith moved in the trial court for postconviction relief. Smith asserted two grounds for relief in his petition:

A. Petitioner SMITH was denied the effective assistance of counsel during trial preparation, at trial and at sentencing all in contravention of his Sixth Amendment rights under the United States Constitution and Article I, Section 10 of the Ohio Constitution.

B. Petitioner SMITH was denied due process in imposition of the maximum sentence for felonious assault and in sentencing as a "repeat violent offender" under O.R.C. § 2941.14, in contravention of his Fifth and Fourteenth Amendment rights under the United States Constitution.

Mr. Smith claimed that he had been unavoidably prevented from discovering earlier the facts upon which he relied in the petition. On 8 December 1998, the trial court denied Smith's petition because it was untimely filed and because Smith failed to present any compelling reason to waive the filing deadline.

Mr. Smith timely appealed the denial of his petition for postconviction relief. He asserted two assignments of error in the appellate court:

*FIRST ASSIGNMENT OF ERROR* THE TRIAL COURT ERRED IN DISMISSING APPELLANT'S PETITION FOR POST–CONVICTION RELIEF AS BEING UNTIMELY FILED.

*SECOND ASSIGNMENT OF ERROR* THE TRIAL COURT ERRED IN DENYING A HEARING ON DEFENDANT–APPELLANT'S PETITION FOR POST–CONVICTION RELIEF.

On 28 February 2000, the appellate court affirmed the judgment of the trial court.

Mr. Smith timely filed an appeal of this decision to the Ohio Supreme Court. Smith raised one proposition of law in his memorandum in support of jurisdiction:

*PROPOSITION OF LAW NUMBER 1:* THE COURT OF APPEALS FOR THE EIGHTH APPELLATE DISTRICT ERRED IN FINDING THAT APPELLANT SMITH FAILED TO DEMONSTRATE HE WAS UNAVOIDABLY PREVENTED FROM DISCOVERING THE FACTS RELIED UPON IN HIS POST CONVICTION MOTION, AND THE COURT OF APPEALS THEREFORE ERRED IN AFFIRMING THE TRIAL COURT'S DENIAL OF THE POST CONVICTION MOTION AS UNTIMELY FILED.

The Ohio Supreme Court dismissed Mr. Smith's appeal as not involving any substantial constitutional question on 14 June 2000.

### C. Application for reopening

On 19 November 1998 Mr. Smith filed in the state appellate court an application for reopening his direct appeal pursuant to Ohio App. R. 26(B). In his application, Smith argued that appellate counsel had been ineffective in not arguing that Smith was denied due process when the trial court imposed the maximum sentence for felonious assault because Smith was a "repeat violent offender" under Ohio Rev. Code § 2941.14. The appellate court granted Mr. Smith's application for reopening on 14 May 1999. In granting Smith's application, the appellate court limited the issue on appeal to the following assignment of error:

APPELLANT SMITH WAS DENIED DUE PROCESS IN IMPOSITION OF THE MAXIMUM SENTENCE FOR FELONIOUS ASSAULT AND IN SENTENCING AS A "REPEAT VIOLENT OFFENDER" UNDER O.R.C. § 2941.14, IN CONTRAVENTION OF HIS FIFTH AND FOURTEENTH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION.

On 3 January 2000, the court overruled Mr. Smith's assignment of error and affirmed the post-conviction judgment of the trial court.

On 17 February 2000, Smith timely appealed the appellate court's decision to the Ohio Supreme Court. He asserted one proposition of law in his memorandum in support of jurisdiction:

*PROPOSITION OF LAW NUMBER 1:* THE COURT OF APPEALS FOR THE EIGHTH APPELLATE DISTRICT ERRED IN FINDING THAT SUFFICIENT EVIDENCE EXISTED IN THE RECORD TO SUPPORT IM-

POSITION OF THE MAXIMUM SENTENCE FOR FELONIOUS ASSAULT AND AN ADDITIONAL NINE (9) YEAR SENTENCE ON THE "REPEAT VIOLENT OFFENDER" SPECIFICATION; AND FURTHER ERRED IN FINDING THE TRIAL COURT HAD ADEQUATELY RECITED ON THE RECORD ITS REASONS FOR IMPOSING SAME.

On 3 May 2000, the Ohio Supreme Court dismissed Smith's appeal as not involving any substantial constitutional question.

### D. Petition for a federal writ of habeas corpus

Smith filed a petition for a federal writ of habeas corpus in this court on 5 December 2001. Smith raises five grounds for relief:

#### A. GROUND FOR RELIEF NO. 1:

Given the Court of Appeals' Opinion rendered in the wake of a remand from the United States Supreme Court for reconsideration in the light of *Lilly v. Virginia,* that the statement incriminating the accused in the charged offense was improperly considered by the jury in violation of the right of confrontation, the Court's ultimate position that the jury's consideration of this evidence as proof of guilt was harmless error is not only nonsensical, it cannot survive meaningful scrutiny. The effect of this is the sentence is illegal.

#### B. GROUND FOR RELIEF NO. 2:

The Court's conclusion that inasmuch as the accusations and the like made in the non-testifying declarant's written statement, in which (in addition to other accusations of criminal conduct) she *also* identified petitioner as the shooter, corroborated the *identification* testimony provided by the alleged victim, the jury's consideration of this statement (in its entirety) was harmless and this was so despite all of the other references made therein to petitioner—including the charge he was a major drug dealer and actually threatened the declarant and even forced her to drive him around while he sought to collect a $500,000 drug debt.

#### C. GROUND FOR RELIEF NO. 3:

Due process was denied the appellant when the State, arguably for ulterior motives, delayed moving to dismiss the case against Iris Wilson, a co-defendant, until after the jury was selected.

#### D. GROUND FOR RELIEF NO. 4:

In a trial where positive identification is a crucial issue and has not previously been made, the unanticipated surprise positive identification of the defendant by a State witness constitutes prejudicial error requiring a new trial when the State has failed to follow any valid identification procedures.

#### E. GROUND FOR RELIEF NO. 5:

The defendant was denied due process when the prosecutor wilfully, and for ulterior purposes, elicited from several prosecution witnesses egregiously prejudicial and inflammatory testimony, which produced evidence that insinuated the defendant had committed various uncharged criminal acts.

Respondent filed a return of writ on 11 March 2002 (Docket # 12). The transcript of the state court proceedings has been filed.[5] (Docket # 25).

---

**5.** This is a complete trial transcript, except that it does not include jury selection, which is not at issue in this petition.

### III. MAGISTRATE JUDGE'S R & R AND PARTIES' OBJECTIONS

Magistrate Judge Hemann issued her R & R on 6 June 2002. (Docket # 20). In her R & R, Magistrate Judge Hemann recommends granting the petition for a writ of habeas corpus on the basis of the first ground for relief, that the Ohio Court of Appeals' determination that the improper admission of Iris Wilson's statement was harmless error was an unreasonable application of federal law. She recommends dismissing the second ground for relief as incomprehensible or superfluous. Magistrate Judge Hemann concludes that the third and fourth grounds for relief have been procedurally defaulted by petitioner. Finally, she recommends dismissal of the fifth ground for relief regarding allegedly prejudicial statements by the prosecutor because she cannot say that the state appellate court's finding that Smith failed to show that the state acted improperly or prejudiced his rights was an unreasonable determination of the facts.

Respondent objects to Magistrate Judge Hemann's recommendation that the petition be granted on Smith's first ground of relief. Specifically, petitioner contends that the Magistrate Judge's finding that the admission of Wilson's statement was not harmless is clear error.

Petitioner filed Limited Objections to the R & R. His first objection is to Magistrate Judge Hemann's statement in a footnote that his petition was not filed within the limitation period of 28 U.S.C. § 2244(d)(1). Smith's second objection is to the Magistrate Judge's recommendation that the second ground of relief be dismissed as incomprehensible. Petitioner's counsel admits that the second ground of relief was poorly drafted and attempts to clarify its meaning.

Neither party has objected to the Magistrate Judge's recommendation that grounds for relief three, four, and five should be dismissed. Therefore, it must be assumed that the parties are satisfied with this recommendation. Any further review by this Court would be a duplicative and inefficient use of the Court's limited resources. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of Health and Human Services,* 932 F.2d 505 (6th Cir.1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981). Accordingly, this Court adopts the Magistrate Judge's recommendation that the third, fourth, and fifth grounds for relief be rejected.

#### A. Smith's Limited Objections

Smith offers two objections to the R & R. First, he objects to Magistrate Judge Hemann's statement in a footnote that his petition was not filed within the limitation period of 28 U.S.C. § 2244(d)(1). The Magistrate Judge merely "noted in passing" her view that the petition was not filed within the limitation period. (R & R at 18, n. 2). However, she then stated that the respondent waived the affirmative statute of limitations defense. (R & R at 18, n. 2). As the statement did not affect the Magistrate Judge's analysis and does not affect this Court's analysis below, no further discussion of this objection is necessary.

Smith's second objection is to the Magistrate Judge's recommendation that the second ground of relief be dismissed as incomprehensible. In his petition, Smith presents his second ground for relief as follows:

The Court's conclusion that inasmuch as the accusations and the like made in the non-testifying declarant's written statement, in which (in addition to other accusations of criminal conduct) she *also* identified petitioner as the shooter, corroborated the *identification* testimony provided by the alleged victim, the jury's consideration of this statement (in

its entirety) was harmless and this was so despite all of the other references made therein to petitioner—including the charge he was a major drug dealer and actually threatened the declarant and even forced her to drive him around while he sought to collect a $500,000 drug debt.

On its face, this incomplete sentence is, in fact, incomprehensible.

In his objection, Smith's counsel represents that he meant the following:

The State Court's conclusion that the jury's consideration of the contents of a non-testifying declarant's written statement was harmless, because the statement only corroborated identification testimony by the alleged victim, cannot survive meaningful scrutiny.

(Docket # 24 at 2). Framed this way, the second ground for relief repeats the substance of the first ground for relief, which is discussed below.

Smith's second objection is overruled. Because the second ground for relief is either incomprehensible or repetitive, it cannot support Smith's petition for a writ of habeas corpus and is dismissed.

## B. Respondent's Objection

Essentially, respondent objects to the Magistrate Judge's entire analysis with respect to the first ground for relief. The Court will review this ground for relief *de novo*.

### 1. *Exhaustion of State Remedies*

As a preliminary matter, a state prisoner must exhaust all possible state remedies or have no remaining state remedies before a federal court will review a petition for a writ of habeas corpus. 28 U.S.C. § 2254(b) and (c). In order to properly exhaust state remedies, a petitioner must fairly present the substance of his federal constitutional claims to the state courts. *Picard v. Connor*, 404 U.S. 270, 275–276, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). If a petitioner fails to fairly present any federal habeas claims to the state courts but has no remaining state remedies, then petitioner has waived, or procedurally defaulted, those claims. *Id.* at 848, 119 S.Ct. 1728; *Hannah v. Conley*, 49 F.3d 1193, 1195–96 (6th Cir. 1995).

Smith presented the substance of his first ground for relief to the Ohio Court of Appeals and to the Supreme Court of Ohio. No state remedies remain available to him for this claim. As Smith has fairly presented his claim to the state courts, the exhaustion requirement is satisfied as to the first ground for relief.[6]

### 2. *Standard of Review*

Because Smith filed his petition for a writ of habeas corpus on 5 December 2001, after the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") became effective, the provisions of the AEDPA govern this case. "The AEDPA limits the ability of federal courts to grant writs of habeas corpus where a state court has considered the federal claim on its merits." *Zobel v. Tate*, 36 Fed.Appx. 772, 776–76 (6th Cir.2002). The statute provides:

An application for a writ of habeas corpus on behalf of a person in custody

---

**6.** Magistrate Judge Hemann reached the same conclusion. (R & R at 19). Neither party objected to this determination.

pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A decision involves an "unreasonable application" of federal law if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the particular state prisoner's case," *Id.* at 413, 120 S.Ct. 1495, or if the state court "either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context." *Campbell v. Coyle*, 260 F.3d 531, 539 (6th Cir.2001).

A federal court "may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411, 120 S.Ct. 1495. Moreover, a federal court must presume that a state court's determination of factual issues is correct. A petitioner has "the burden of rebutting the

presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360–61 (6th Cir.1998).

*3. The Confrontation Clause and Lilly*

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The Clause is applied to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

> The Confrontation Clause is a constitutional safeguard that ensures a defendant will not be convicted based on the charges of unseen, unknown, and unchallengeable witnesses. Thus, the Confrontation Clause bars the admission of some evidence that would otherwise be admissible under a hearsay exception. When a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause requires a showing that he is unavailable and that the statement bears adequate "indicia of reliability." The reliability standard can be satisfied without more in a case where the evidence falls within a firmly rooted hearsay exception. Otherwise, to satisfy the Confrontation Clause, the evidence must be supported by a showing of "particularized guarantees of trustworthiness."

*Gilliam v. Mitchell*, 179 F.3d 990, 993 (6th Cir.1999) (internal citations omitted).

In *Lilly v. Virginia*, the U.S. Supreme Court held that "accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule." 527 U.S. 116, 134, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999). The Court characterized such statements as "inherently unreliable" and noted that Supreme

Court "cases consistently have viewed an accomplice's statements that shift or spread the blame to a criminal defendant as falling outside the realm of those hearsay exceptions that are so trustworthy that adversarial testing can be expected to add little to the statements' reliability." *Id.* at 134, 119 S.Ct. 1887 (internal punctuation omitted). The Court further explained,

It is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old *ex parte* affidavit practice—that is, when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing.

*Id.* at 137, 119 S.Ct. 1887. In *Lilly,* the Court concluded that the existence of evidence corroborating the truth of the hearsay statement, the fact that the police informed the declarant of his *Miranda* rights before he gave the statement, and the absence of an express promise of leniency to the declarant by the police did not amount to particularized guarantees of trustworthiness. *Id.* at 137–140, 119 S.Ct. 1887.

*4. Whether the State Appellate Court Reasonably Applied Lilly*

■ In his first ground for relief, Smith contends that the admission of Iris Wilson's statement regarding his involvement in the shooting of Kenyatta Wells violated the Confrontation Clause and that the Ohio Court of Appeals' determination that the violation was harmless error was an unreasonable application of *Lilly.*

Wilson's statement was admitted in evidence after Wilson invoked her Fifth Amendment privilege against self-incrimination and refused to testify at Smith's trial. The trial judge admitted the state-ment pursuant to Ohio Evid. R. 804(B)(3), which makes admissible statements which would otherwise be excluded as hearsay. In particular, the rule permits the admission of certain statements against the declarant's interests:

(B) The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(3) A statement that ... at the time of its making ... so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true.

The Ohio Court of Appeals upheld the trial court's decision to admit Wilson's statement. After the Ohio Supreme Court dismissed Smith's appeal as not involving any substantial constitutional issue, the United States Supreme Court vacated the Ohio Court of Appeals' decision on the basis of *Lilly* and remanded the case to the Ohio Court of Appeals for reconsideration in light of *Lilly.* (Exhibit 12).

On remand, the Ohio Court of Appeals stated,

Therefore, upon remand, we are obligated to consider the presumptively unreliable statement given by Wilson to the police which the state introduced at trial to identify Smith as the perpetrator in this shooting. Here, as in *Lilly,* we are concerned whether the admission of that statement constitutes harmless error beyond a reasonable doubt.

(Exhibit 15 at 6). The state appellate court also noted, "we have considered whether the violation of the Confrontation Clause constitutes harmless error beyond a reasonable doubt and have concluded that admission of Iris Wilson's statement constitutes harmless error." (Exhibit 15 at 2). These two passages indicate that

the Ohio Court of Appeals began its analysis from the premise that the admission of Wilson's statement was error, and that it saw its role as one of determining whether the error was harmless or not.

However, later in its opinion, the state appellate court engages in some analysis of whether there were sufficient indicia of reliability for the trial court to have properly admit Wilson's statement:

> The record before us contains no evidence that at the time Wilson gave her statement, she was coerced or under duress. We do know that she had counsel, who had advised her by telephone not to make a statement, but that after speaking with him, she waived her rights and voluntarily chose to make a statement to the police about the incident. Nothing suggests any offer or consideration had been extended to her or her counsel at that point in time, and the inferences from the subsequent events even up to the day of trial corroborate that no such offer had been extended to her in an effort to have her incriminate Smith. This is strong evidence that she acted independent of Smith and that her statement is trustworthy because it had not been given in exchange for some negotiated leniency. Further, the prosecutor did not offer her transactional immunity until a month later, after the trial had started, and after the court ruled that her written statement would not be admitted into evidence.

(Exhibit 15 at 6–7).

Respondent concedes that the admission of the statement violated the Confrontation Clause. In his return of writ, respondent states, "statements like the one admitted at Smith's trial constitute violations of the Confrontation Clause and must be reviewed for harmless error." (Docket # 12 at 15).

Iris Wilson's statement is the type of statement that concerned the Supreme Court in *Lilly*. Wilson, an accomplice of Smith, gave the police a confession that inculpated Smith. In her statement, Wilson minimized her role in the shooting and shifted blame on to Smith. Wilson claimed that Smith "made" her go to Bootsie's mother's house and "had" her drive Smith "around town all day looking for Bootsie." (Tr. at 451–452, 454). She stated that Smith "made" her chase the truck driven by Wells. (Tr. at 452). Wilson made no mention of twice shouting Bootsie's name toward the truck. She described the situation in such a way as to convey that she was shocked by the shooting and had no inkling that it might occur. Wilson further stated that, after the shooting, she was told to drive away. (Tr. at 452). Thus, although portions of the confession are self-inculpatory, significant portions were exculpatory and blame-shifting. Moreover, the statement was the product of an interrogation by Detective Wheeler and was never subjected to cross-examination.

Under *Lilly*, Wilson's statement is presumptively unreliable. The state appellate court appears to accept that the admission of the statement was error. However, to the extent that the Ohio Court of Appeals implicitly determined that the statement was properly admitted as supported by particularized guarantees of trustworthiness, this determination is an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States in *Lilly*.

The factors discussed by the Ohio Court of Appeals do not establish the existence of particularized guarantees of trustworthiness. The court's statement that "[t]he record before us contains no evidence that at the time Wilson gave her statement, she was coerced or under duress" has been contradicted by clear and convincing evi-

dence and is an unreasonable determination of the facts in light of the full record in this case. While testifying at trial, Detective Wheeler agreed that he "decided to soften [Wilson] up by letting her languish there in jail for a couple of days while she worried about her children until 2100 hours of the 19th when a lawyer couldn't get there. (Tr. at 486–87). Wilson's attorney, Camino, testified that Wilson "had three or four kids at home" and wanted to get out of jail "in the worst kind of way." (Tr. at 572). He also testified that Detective "Wheeler made it clear after she made a statement that she would be able to get out of jail and he had seen to it to get her bond reduced or get her a low bond if she would make the statement." (Tr. at 572). According to Camino, he "asked Detective Wheeler if he was going to charge her. And he said, that he would do that after he took her statement just to get her out." (Tr. at 569).

Ms. Wilson was held in custody for over two days, an unconstitutionally-long amount of time, before being brought before a magistrate for a probable cause hearing. *See County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). When all relevant testimony, it is clear that she was eager to be released and that she and her attorney were informed that, after she made a statement, she would be released on a low bond. In light of these facts, it is simply not reasonable to conclude that "[t]he record before us contains *no* evidence that at the time Wilson gave her statement, she was coerced or under duress."

Similarly, the state appellate court's statement that "[n]othing suggests any offer or consideration had been extended to her or her counsel" at the time of the statement is an unreasonable assessment of the facts. The record shows that Wilson's attorney understood that she would finally be charged and would receive a lower bond in exchange for her statement. Camino also testified that, after giving a statement to the police, Wilson "got out the next day, the next morning." (Tr. at 569).

The Ohio Court of Appeals noted that Wilson was advised of her rights before she waived them and that her statement was not "given in exchange for some negotiated leniency." In *Lilly,* the Supreme Court specifically addressed these factors and explained that they did not constitute particularized guarantees of trustworthiness. With respect to a declarant's knowledge of her rights, the Supreme Court stated,

> we believe that a suspect's consciousness of his *Miranda* rights has little, if any, bearing on the likelihood of truthfulness of his statements. When a suspect is in custody for his obvious involvement in serious crimes, his knowledge that anything he says may be used against him militates against depending on his veracity.

*Lilly,* 527 U.S. at 138, 119 S.Ct. 1887. With respect to the lack of a negotiated leniency, the Supreme Court stated, "the absence of an express promise of leniency to [the declarant] does not enhance his statements' reliability to the level necessary for their untested admission." *Id.*

Iris Wilson's statement is not accompanied by any particularized guarantees of trustworthiness. Wilson made a statement to police after being detained for more than two days without being charged with a crime or brought before a magistrate for a probable cause hearing. She made the statement without the presence of her counsel, against the advice of her counsel, and in response to Detective Wheeler's statement that she would be charged and released on a lower bond after she gave a statement. In short, there are no factors that suggest that Wil-

son's presumptively unreliable, blame-shifting statement is so reliable that nothing could be gained by cross-examination. To the extent that the Ohio Court of Appeals implicitly determined that the admission of the statement did not violate the Confrontation Clause, that determination was an unreasonable application of *Lilly.*

### 5. Whether the State Appellate Court Reasonably Applied Chapman

█ The admission of Wilson's statement did violate the Confrontation Clause. As Confrontation Clause violations are subject to harmless error review,[7] the next question is whether the Ohio Court of Appeals' determination that the error was harmless beyond a reasonable doubt was an unreasonable application of clearly established federal law.

█ A state appellate court's harmless error analysis on direct appeal differs from that of a federal district court on habeas corpus review. In *Bulls v. Jones,* the Sixth Circuit explained,

> On direct appeal, a constitutional error such as a Confrontation Clause violation is harmless only if the reviewing court finds it was harmless beyond a reasonable doubt. *See* [*Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ]. Federal habeas courts, however, utilize a different standard when reviewing state court harmless error decisions. In *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the Supreme Court decided that although state courts were still required to apply the *Chapman* beyond a reasonable doubt standard on direct review, federal courts on habeas review must determine whether the constitutional trial error "had a substantial and injurious effect or influence

in determining the jury's verdict." *See Brecht,* 507 U.S. at 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (citing *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). We have confirmed that the *Brecht* test continues to apply after the enactment of the Antiterrorism & Effective Death Penalty Act of 1996, and that if a habeas petitioner satisfies the *Brecht* standard, "he will surely have demonstrated that the state court's finding that the error was harmless beyond a reasonable doubt ... resulted from an unreasonable application of *Chapman.*" *See Nevers v. Killinger,* 169 F.3d 352, 371–72 (6th Cir.1999) ... In satisfying the *Brecht* standard, the habeas petitioner bears the burden of demonstrating that the trial error resulted in "actual prejudice." *Nevers,* 169 F.3d at 371.

*Bulls v. Jones,* 274 F.3d 329, 334–35 (6th Cir.2001) (footnote omitted). *See also, Zobel v. Tate,* at 777–78(6th Cir.2002) (stating "The *Brecht* standard, rather than the *Chapman* standard, applies in all federal habeas proceedings"). In determining whether the error resulted in actual prejudice, a federal district court should review the state trial record and focus on "what effect the error had or reasonably may be taken to have had upon the jury's decision." *Brecht,* 507 U.S. at 643, 113 S.Ct. 1710. If the improper introduction of a statement "rendered the government's case against [the petitioner] significantly more persuasive," then the *Brecht* standard is met. *Vincent v. Seabold,* 226 F.3d 681, 690 (6th Cir.2000).

Thus, this Court can grant habeas relief only if Mr. Smith shows that the Confrontation Clause violation had a substantial

---

**7.** *See Bulls v. Jones,* 274 F.3d 329, 334 (6th Cir.2001); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

and injurious effect or influence in determining the jury's verdict.

■ The Ohio Court of Appeals found that admitting Ms. Wilson's statement was harmless beyond a reasonable doubt. The court explained this finding as follows:

We are ... persuaded that overwhelming evidence of Smith's identity exists in the record exclusive of Wilson's statement. Two witnesses, Wells and Officer Jones, each of whom testified about Smith as the gunman and each of whom had separate involvement in the case. Their testimony, standing alone, could have provided an independent basis for the jury's verdict, and Wilson's written statement merely served to corroborate other evidence of Smith's identity and did not, therefore, by itself, form the basis of the jury's verdict. Accordingly, we have concluded that the admission of Wilson's written statement in this case constitutes harmless error beyond a reasonable doubt.

(Exhibit 15 at 7–8).

It appears that the Ohio Court of Appeals meant to refer to Officer Lynch, who was working part-time as the Finast security guard, rather than Officer Jones. It was Lynch who testified regarding Rogers' excited utterance that Paul was the shooter and that Iris was present at the time of the shooting. (Tr. at 521–522, 525, 536, 538). Officer Jones merely testified that his investigation uncovered the first names of the driver of the car and the shooter; no where in his testimony did he identify either the driver or the shooter. (Tr. at 374–375).

When the powerful probative and prejudicial value of Ms. Wilson's improperly-admitted statement is viewed in the context of the other evidence against Smith, it is clear that the state appellate court's conclusion that the admission was harmless was unreasonable.

The statement of Iris Wilson is very strong evidence against Smith. The statement describes Smith as the shooter: "The next thing I knew, Paul was shooting in the car." (Tr. at 452). It relays an admission by Petitioner Smith that he shot Wells: "I asked Paul why did he shoot at them. He said because they acted like they wanted to run." (Tr. at 452–453). The statement generally corroborated Kenyatta Wells' version of events and specifically confirmed that Smith was Jamaican and that other Jamaicans were in the car driven by Ms. Wilson. (Tr. at 453). Wilson also stated, "Paul had us ride around town all day looking for "Bootsie" ... because "Bootsie" owed him some money. He told me that "Bootsie" owed him $500,000 for drugs." (Tr. at 451–452). This improperly-admitted statement was the only evidence providing a motive for the crime. Although motive is not an essential element of the offense of felonious assault, the discussion of the drug debt strengthened the government's case by answering an important question for the jury: "why would Paul Smith shoot into the truck?"

Aside from its strictly probative value, Ms. Wilson's statement was prejudicial to Smith. Wilson makes multiple references to Smith forcing her to engage in specific acts, such as searching for Rogers, chasing the truck, and driving away from the scene of the shooting. (Tr. at 451–453). The statement offers the only mention of the $500,000 drug debt. It also contains a description of the types of persons who associate with Smith: "During the course of us riding the male stated that he would hurt me. He also stated to me that he could get to me because they are not going to catch up with him." (Tr. at 453). Although Mr. Smith's apparent link to illegal drugs and association with a person who threatened to physically harm Ms. Wilson were not directly at issue in the trial, the

references to these facts depicted Smith as a "bad guy." Regardless of whether it should have, such a depiction may well have had an adverse effect on the jury.

Wilson's statement was read to the jury by Detective Wheeler and referred to by the prosecution in its closing arguments. In their arguments, the prosecutors reviewed the substance of the statement in detail and summarized it in a simple yet powerful way for the jury: "She tells you that she was the driver. And she tells you that Paul was the shooter." (Tr. at 585–586, 614–616).

The other evidence against Mr. Smith was not overwhelming. Only Wells and Lynch testified as to the identity of the shooter. There was no physical evidence against Smith; no gun, fingerprints, or ballistics evidence was presented.

Mr. Wells' testimony was ambiguous and, therefore, may not have been convincing to a jury without significant corroboration. Wells testified that "Paul Smith exited the car, came around and repeated 'mother fucker' and shot the window out and put his hand into the car and started shooting." (Tr. at 312). However, when asked, "Did you recognize him at that point in time?," Wells stated, "No, I didn't." (Tr. at 312–313). He then testified that he realized who shot him only after Rogers (Bootsie) exclaimed that it was Iris and Paul. (Tr. at 313–314). Wells reiterated that he did not recognize Wilson or Smith at the time of the shooting. (Tr. at 314). Wells further testified that he knew Smith for two years (Tr. at 318) and recognized the Jamaican accent of the shooter. (Tr. at 336–337, 339–340). He also twice identified Paul Smith in the courtroom. (Tr. at 319–320, 326–327).

The Wells testimony is ambiguous in the sense that the basis of Wells' knowledge and identification of Smith as the shooter is unclear. It is possible that the jury found that Wells had personal knowledge that Smith shot him. However, the jury also could have found that Wells never recognized Smith as the shooter and only identified him as the shooter because Rogers exclaimed that he was. Given that Rogers did not testify, the jury may not have found Wells' testimony compelling in the absence of the improperly-admitted Wilson statement.

The only other witness to identify Smith as the shooter was Officer Lynch, who was working part-time as a security guard at the Finast. Lynch had no first-hand knowledge of the shooting. He simply relayed Rogers' excited utterance that someone named Paul was the shooter. (Tr. 521–522, 525, 536, 538).

It may well be that the testimony of Wells and Lynch, taken together, would be sufficient to sustain a conviction against Smith. However, that is not the test. The question is whether the admission of Iris Wilson's statement had a substantial and injurious effect or influence in determining the jury's verdict. This Court finds that it did. Her statement is highly incriminating and prejudicial. Moreover, although there was other testimonial evidence against Smith, it was ambiguous and not overwhelming. Iris Wilson's statement provided compelling corroboration for the testimony of Wells and Lynch. Once the statement is viewed in the context of the entire state record, there is no question that Wilson's statement rendered the government's case against Smith significantly more persuasive.

This Court concludes that the unconstitutional admission of Iris Wilson's written statement had a substantial and injurious influence in determining the jury's verdict. Accordingly, the Ohio Court of Appeals' determination that the error was harmless was an unreasonable application of *Chapman*. Smith's first ground for relief war-

rants the issuance of a writ of habeas corpus.

## IV. CONCLUSION

The Magistrate Judge's recommendations are adopted. Grounds for relief two, three, four, and five are dismissed. Ground for relief one is meritorious and entitles petitioner to a writ of habeas corpus.

Accordingly, Paul Smith's petition for a writ of habeas corpus is conditionally granted. The State of Ohio shall retry petitioner or release him from custody within 120 days of the date of this order. If the State of Ohio fails to take such action, Mr. Smith may petition this Court for an additional writ unconditionally releasing him from state custody.

IT IS SO ORDERED.